Damon Lyons, trustee,[1] *vs.* Robert L. Nutt & others.[2]

Essex. December 5, 2001. - March 7, 2002.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Limitations, Statute of. Negligence,* Attorney at law. *Attorney at Law,* Malpractice, Negligence.

In an action alleging legal malpractice against five partners and a former associate of a law firm, the trial judge correctly allowed the defendants' motion for summary judgment on the ground that the applicable three-year statute of limitations barred the action, where there was no genuine dispute of material fact as to the plaintiff's knowledge of malpractice on the part of the law firm, and where the "continuing representation" doctrine did not apply to toll the running of the statute because the plaintiff did not innocently rely on the continuing representation of the law firm. [247-251]

Civil action commenced in the Superior Court Department on July 31, 1998.

The case was heard by *Richard E. Welch, III,* J., on a motion for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*Wendy H. Sibbison* for the plaintiff.

*Richard W. Renehan (David S. Friedman* with him) for the defendants.

Spina, J. On July 31, 1998, Damon Lyons filed a complaint alleging legal malpractice against five partners and a former associate of the law firm Ropes & Gray. Acting on the defendants' motion for summary judgment, a judge in the Superior Court concluded that the complaint should have been filed by October, 1991, and therefore was barred by the three-year statute of limitations applicable to legal malpractice cases, G. L. c. 260,

---

[1]Of the Robin Damon Trust and individually.

[2]David M. Donaldson (deceased); Nicholas Grace; Robert Gad, Third; John M. Harrington; and Michael R. Pontrelli.

§ 4. In his appeal, Lyons argues that the "continuing representation" doctrine should have been applied to toll the running of the statute. We granted his application for direct appellate review. We hold that the doctrine does not apply in this case because Lyons did not innocently rely on the continuing representation of Ropes & Gray. We affirm the judgment.

We recite the material facts in the light most favorable to Lyons, as the nonmoving party. See *Miller* v. *Mooney*, 431 Mass. 57, 60 (2000). At all relevant times, Lyons and Cyrus J. Newbegin were cotrustees of the Robin Damon Trust, a testamentary trust whose principal asset consisted of the capital stock in the Salem News Publishing Company, a Massachusetts corporation that published the Salem Evening News. In August, 1987, the trustees received a written cash offer to purchase the stock of the company for $40 million. The offer was four times the company's gross revenues, the high end of newspaper valuation. Lyons told Newbegin that he thought the offer was a good one and should be accepted because it would increase the income of the beneficiaries approximately twentyfold. Newbegin refused to sell the company, and rejected the offer.

Believing Newbegin's refusal to be a breach of the trustees' fiduciary duties under the terms of the trust, which required diversification of assets, Lyons consulted Ropes & Gray in December, 1987, in his capacity as cotrustee. He instructed Ropes & Gray to take whatever action was necessary to accept the offer to purchase the company. In February, 1988, Ropes & Gray wrote to Newbegin's attorney explaining that the trustees would be in clear violation of the terms of the trust, as well as general fiduciary principles, if they did not respond promptly and effectively to the offer. The letter also stated that Lyons was under a duty to force Newbegin to live up to his fiduciary duties if the matter could not be resolved promptly.

In February, 1988, the offer was increased to $42.5 million. Newbegin remained steadfast in his refusal to sell. In May, 1988, Ropes & Gray prepared for filing in the Probate Court a complaint seeking instructions that the trustees obtain a current appraisal of the fair market value of the company and that the company stock be sold for not less than its appraised value. The offer to purchase was withdrawn in October, 1988. The

complaint for instructions was not filed until September, 1989.[3] It was dismissed in February, 1991, as moot because the offer had been withdrawn.

In October, 1990, and July, 1992, four of the trust's sixty-eight beneficiaries (Spinner beneficiaries) filed petitions in the Probate Court seeking to remove Lyons and Newbegin as trustees and to surcharge them for allegedly breaching their duty to diversify the trust res. Thomas Hannigan, an attorney with Ropes & Gray who is not a defendant in this action, represented Lyons in these and other Probate Court proceedings.

In August, 1992, the Spinner beneficiaries filed an action for legal malpractice against the defendants in this action (attorneys for Lyons), and against the attorneys for Newbegin, alleging that the attorneys were responsible for the trustees' failure to "take timely advantage of an offer to purchase" the company, the same allegations raised in this action by Lyons. That action was dismissed for failure to state a claim on which relief can be granted. We affirmed the judgment, holding that the Spinner beneficiaries could not pursue malpractice claims against the attorneys for the trustees because the attorneys owed no duty to the beneficiaries. See *Spinner* v. *Nutt*, 417 Mass. 549, 553 (1994). We mentioned, however, that, if the beneficiaries brought suit against the trustees, the trustees, in turn, could bring a malpractice action against the attorneys, if appropriate. *Id.* at 555. In the meantime, the trustees sold the stock of the company in March, 1995, for $16.5 million.

In late June or early July, 1995, Hannigan recommended that Lyons hire other counsel to represent him in the pending Probate Court proceedings because attorneys from Ropes & Gray were likely to be called as witnesses for Lyons in those proceedings. Those proceedings had been subject to an automatic stay as a result of Lyons's petition for personal bankruptcy, filed on July 19, 1993.[4] On July 25, 1995, Lyons met with Hannigan and

---

[3]The allegations of malpractice are hotly contested. In his deposition, the offeror stated that, consistent with newspaper industry practice, he would not have purchased the company if Newbegin had been under an order to sell it. He would have purchased the company only if Newbegin had been a willing seller, a position he made known to the parties in October, 1988.

[4]Lyons was not represented by Ropes & Gray on his bankruptcy petition.

successor counsel to discuss the transition. Lyons acknowledged in his deposition that successor counsel "took over" representation as of July 25, 1995. Hannigan began transferring files to successor counsel on July 25. Additional files were transferred on July 31 and August 8, 1995. Successor counsel began billing Lyons for his time as of July 26, 1995. On August 7, 1995, the notice of withdrawal of Ropes & Gray and the notice of appearance of successor counsel were filed in the Probate Court.

On October 16, 1997, the Bankruptcy Court granted partial relief to the Spinner beneficiaries from the automatic stay. The judge allowed them to proceed on their Probate Court petitions to remove Lyons as a cotrustee of the trust, but it denied relief to the extent that the beneficiaries sought damages against Lyons for alleged breach of fiduciary duty. On July 24, 1998, the Spinner beneficiaries settled their surviving claims with Lyons. Under the terms of the settlement, Lyons, as trustee, agreed to engage the Spinner beneficiaries' counsel to bring an action for legal malpractice against Ropes & Gray, and to pay to the trust any amounts recovered in that litigation. The present action was filed on July 31, 1998. Lyons alleged in his complaint for legal malpractice that the defendants were negligent in their failure seasonably and reasonably to advise him and seek the instruction of the Probate Court and secure orders which would have brought about the sale of the company in accordance with the $42.5 million offer.

*Discussion.* The statute of limitations applicable to a legal malpractice claim begins to run when a client "knows or reasonably should know that he or she has sustained appreciable harm as a result of the lawyer's conduct." *Williams* v. *Ely*, 423 Mass. 467, 473 (1996). This is the so-called discovery rule. The judge determined that the statute of limitations began to run in October, 1988.[5] He based this on an admission made by Lyons during his deposition that, when the offeror walked away from

---

[5]The judge concluded, alternatively, that, if the statute of limitations had not begun to run in October, 1988, it would have begun to run in March, 1995, when the company was sold for $16.5 million, because "a reasonable person would be aware of the considerable harm that had occurred." The judge further determined that, at the least, the "continuing representation" doctrine ceased to apply as of July 25, 1995, when, as Lyons admitted in his deposition, successor counsel "took over" from Ropes & Gray. Because we agree

the deal in October, 1988, he realized that Ropes & Gray "didn't know what they were doing."[6]

Lyons first argues that the judge erred by concluding that there was no genuine dispute of material fact as to his knowledge of malpractice on the part of Ropes & Gray. He contends that his deposition testimony is ambiguous on the question of his knowledge, and that two affidavits he filed in opposition to summary judgment establish the existence of a triable fact.[7]

---

that the statute of limitations began to run in October, 1988, we do not consider these points.

[6] The admission appears in the following portion of Lyons's deposition:

Q.: "Sir, when was it . . . that you first came to the conclusion that Ropes & Gray . . . had acted with malpractice?"

A.: "That would be January, '89, when . . . Ropes & Gray discharged him from the case."

Q.: "January, '89?"

A.: "Have I got the wrong date? Bob Gad went on for a full year, okay? Then an internal — whatever — occurred within Ropes & Gray, and he stepped out."

Q.: "And Mike Harrington stepped in?"

A.: "Yes."

Q.: "And you felt at that time there had been malpractice?"

A.: "Up to that point?"

Q.: "Yes."

A.: "Yes, and thereafter, too."

Q.: "Okay. Did you ever express that view to any lawyer at Ropes & Gray?"

A.: "No. I wasn't going to spit in their face. They were my lawyers, you know. They knew what they were doing. They — if they didn't counsel me, fine. They knew what — but still they knew what they were doing. But it turns out they didn't."

Q.: "When did you conclude — this is the date I'm trying to get — when did you conclude that [Ropes & Gray] didn't know what they were doing?"

A.: "When [the offeror] went away."

Q.: "When was that? Is that the October, [1988,] date we have been talking about?"

A.: "I believe so. Whenever he went away."

[7] In an affidavit filed approximately one year before his deposition, Lyons asserted that he did not list any malpractice claim against Ropes & Gray in his bankruptcy petition because he "was unaware that they had committed malpractice." (Other facts, in addition to his deposition, indicate that Lyons

There is no ambiguity in Lyons's deposition testimony. In response to a question asking him to focus on the point in time at which he first concluded that his attorneys did not know what they were doing, Lyons responded that it was when the offeror walked away, which was in October, 1988. Lyons is not helped by his affidavits. His predeposition affidavit only speaks to his lack of awareness of any claim of malpractice. A client need not know that his lawyer was negligent for the cause of action to accrue. He need only know that he "sustained appreciable harm as a result of the lawyer's conduct." *Williams* v. *Ely, supra* at 473. As such, the affidavit is not in conflict with his deposition and it does not create a triable question of fact. Contrast *Palermo* v. *Brennan*, 41 Mass. App. Ct. 503, 508 (1996) (conflict between deposition and prior affidavit, absent election between versions, must be resolved by trial). The postdeposition affidavit contradicts his deposition, but that conflict may not be used to create a disputed issue of fact for the purpose of defeating summary judgment. See *Hanover Ins. Co.* v. *Leeds*, 42 Mass. App. Ct. 54, 58-59 (1997). But see Mass. R. Civ. P. 30 (e), 365 Mass. 780 (1974). The judge correctly concluded that there was no genuine dispute of material fact.

Lyons next argues that the continuing representation doctrine creates a bright-line rule that tolled the running of the statute of limitation until the actual date that his attorney-client relationship with Ropes & Gray ended, namely, August 7, 1995, when the firm withdrew from its representation, or, alternatively, in July, 1998, when attorneys from Ropes & Gray were no longer needed to testify on behalf of Lyons. The continuing representation doctrine, which we adopted in *Murphy* v. *Smith*, 411 Mass. 133 (1991), "recognizes that a person seeking professional assistance has a right to repose confidence in the professional's

---

had actual knowledge that he was appreciably harmed by his attorneys, over three years before he filed suit: [1] the Spinner beneficiaries objected to his failure to list any malpractice claim in his bankruptcy schedule, and [2] our decision in *Spinner* v. *Nutt*, 417 Mass. 549 [1994]).

Approximately three weeks after his deposition Lyons filed an affidavit in which he stated that, as of July 25, 1995, when he met with Hannigan and his successor counsel, "I felt comfortable with this [the transition] and still believed that they were doing a good job. Up to that point at no time had I concluded that they did not know what they were doing."

ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered." *Id.* at 137, quoting *Cantu* v. *St. Paul Cos.*, 401 Mass. 53, 58 (1987). The doctrine has no application, however, where the client actually knows that he suffered appreciable harm as a result of his attorney's conduct. If the client has such knowledge, then there is no "innocent reliance which the continued representation doctrine seeks to protect." *Cantu* v. *St. Paul Cos., supra.*

Lyons contends that, because we did not decide in *Cantu* v. *St. Paul Cos.* whether we would adopt the continuing representation doctrine, our holding that the doctrine does not apply where the client actually knows that he has suffered appreciable harm as a result of his attorney's conduct is merely dictum. He claims that our subsequent adoption of the doctrine in *Murphy* v. *Smith, supra,* without limitation, implies that we adopted the doctrine for all cases, including cases where the client has actual knowledge of harm caused by attorney conduct. We disagree. Our subsequent adoption of the doctrine in *Murphy* v. *Smith, supra,* did not affect the *Cantu* decision, nor did it establish a bright-line rule, as Lyons suggests. Moreover, in *Murphy* v. *Smith,* we quoted *Cantu* v. *St. Paul Cos., supra,* with approval. Although the clients in the *Murphy* case reasonably should have known that they suffered appreciable harm at the hands of their attorney, they had no actual knowledge to that effect. We held that in the circumstances, the continuing representation doctrine would toll the running of the statute of limitations on the clients' legal malpractice claim from the beginning of their attorney's representation until its termination. *Murphy* v. *Smith, supra* at 137-138. We did not say that the doctrine would apply if the client had actual knowledge.

*Spilios* v. *Cohen,* 38 Mass. App. Ct. 338 (1995), is not to the contrary. In that case, the client realized on the eve of trial that her divorce attorney had been negligent by failing to prepare adequately for trial, and by failing to follow her instructions to accept the husband's settlement offer. She confronted the attorney and tried to discharge him. He told her that the judge would not permit him to withdraw his appearance at such a late date, and assured her that he was prepared for trial. She

proceeded to trial represented by the attorney and received a judgment for an amount less than what the husband had offered as a settlement. The Appeals Court concluded that the statute of limitations could not start to run until the client suffered some appreciable harm of which she was aware, or reasonably should be aware. Because no harm could be known until after trial, when the judge's decision would have been announced, the malpractice action, filed within three years of the judge's decision, was not barred by the statute of limitations. The Appeals Court did not rely on the continuing representation doctrine.[8] *Id.* at 340.

Lyons had concluded in October, 1988, when he lost the offer, that Ropes & Gray had performed inadequately. He also knew that the loss of the offer would harm the beneficiaries because he engaged Ropes & Gray to protect the trust against precisely that loss. At that time "the necessary coalescence of discovery and appreciable harm occurred," and the statute of limitations began to run. *Cantu* v. *St. Paul Cos.*, *supra* at 57. The judge correctly declined to apply the continuing representation doctrine.

*Judgment affirmed.*

---

[8]The Appeals Court went on to say, however, that the continuing representation doctrine would provide independent basis for allowing the client to proceed with her malpractice claim. *Spilios* v. *Cohen*, 38 Mass. App. Ct. 338, 341 (1995). The court reasoned that, because her reliance on the attorney was at least partially innocent (she did not have actual knowledge that she suffered appreciable harm during his representation), she could still avail herself of the protection of the doctrine. *Id.* at 342. Because the court decided the case on other grounds, we need not decide whether the alternative holding of the Appeals Court was correct. Here, Lyons had actual knowledge of both elements of the accrual of his cause of action.